IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA



ROCHELLE A PAPURT, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
JEROMEY IAN BELL, A/K/A JEROME
IAN BELL, DECEASED

JAN 2 7 2016

v.                                                    C.A. NO. 15-2523

NORTHAMPTON COUNTY
DEPARTMENT OF CORRECTIONS, et al.

MEMORANDUM OPINION

SCHMEHL, J.                                           JANUARY 27, 2016

This wrongful death and survival action was originally commenced by plaintiff on July

10, 2014 in the Court of Common Pleas of Northampton County, then removed by certain of the

defendants to this Court on May 7, 2015 on the basis of federal question jurisdiction. Plaintiff

was granted leave by the Court to file an Amended Complaint which she filed on July 2, 2015.

Presently before the Court is the motion of defendant PrimeCare Medical, Inc. ("PrimeCare") to

dismiss Counts VII and VIII for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the

reasons that follow, PrimeCare's motion is granted in part and denied in part.

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a plaintiff must

allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007). A complaint has facial plausibility when there is enough

factual content "that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." Ashcroft v. Iqbal, 55 U.S. 662, 678 (2009). A court must accept all

factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. Cnty of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements are to be disregarded. Santiago v. Warminster Twp., 629 F. 3d 121, 128 (3d Cir. 2010).

The Amended Complaint alleges that plaintiff's decedent was "assaulted on the street and admitted to St. Luke's Hospital on June 23, 2012 where he was diagnosed with a subarachnoid hemorrhage . . ." (ECF 13, ¶ 13). He was discharged on June 25, 2012 and thereafter was "incarcerated within Northampton County Prison (the "Prison") from June 29 or June 30, 2012 until he was found unresponsive in his cell on July 7, 2012." (Id.). PrimeCare "provid[es] medical healthcare services at Northampton[] and was supposed to be providing the same to Decedent prior to his death." (Id., ¶ 6). "Easton is an ambulance /paramedic company. . . ., who was called to the Prison to bring Decedent to St. Luke's Hospital after he was found unconscious and/or having a seizure, bleeding from his head." (Id., ¶ 11).

The Amended Complaint further alleges:

14. On June 30 and July 6, 2012, while in the custody and control of the Northampton County Prison, Decedent advised the Department and its staff, including but not limited to the medical staff of the facility in which he was confined that he was experiencing pain in his head from being assaulted (on June 23, 2012). He complained of pain, headache, and dizziness on June 30, 2012 and that his 'head [was] throbbing daily. . . feeling nauseous and dizzy' on July 6, 2012.

15. It was evident that the Defendants were aware of the existence of the Decedent's head/brain injuries as early as June 23, 2012 at which time it was noted in the records of St. Luke's Hospital, Northampton County Prison, and Prime, Inc.

16. On July 7, 2012, Corrections Officers at Northampton County Prison again noticed that Decedent was 'acting funny.' He was exhibiting signs of a serious brain/head injury

2

and/or seizure which, in conjunction with the prior assault and complaints of head pain, should have alerted prison officials and Prime medical personnel to have him brought to the closest Emergency Room.

17. The decedent was stumbling. His limbs were shaking. He was 'staring off to walls.' He complained of blindness. The Prison Officials said that he was exhibiting 'seizure activity' and eventually, after they sent him back to his cell and after it was too late, told that to 9-1-1 operators, who dispatched defendant-Easton Emergency Squad.

18. The Decedent was brought to the infirmary after exhibiting the symptoms noted above, but there is no indication in the medical records that he was seen by a physician or that any aid was rendered or any medical treatment given. Decedent was repeatedly asking where he was. He was 'slow to respond to questioning' and was mumbling to himself. While exhibiting many signs of a serious head//brain injury and/or seizure, the Decedent was dispatched out of the infirmary and back to his cell, where he was found less than an hour later-naked, bleeding from his head and totally nonresponsive. He was essentially brain dead by the time the Prison Officials moved his naked body from between the toilet and the concrete bunk to the center of his cell. Decedent's head was now bleeding–at the right temporal region.

19. From the time that he exhibited typical symptoms of a serious head/brain injury and/or seizure, there was no indication given that care was taken to insure that he was not in a life or death struggle; in fact despite the obvious symptoms, Decedent was sent with Prison Officials back to his cell and left alone rather than being rushed to the nearest Emergency Room.

20. After sending the Decedent back to his cell in acute distress, showing signs of seizure and exhibiting symptoms of a serious head/brain injury and/or seizure, no Prison Official was told to watch Decedent. He was simply thrown back in his cell to die.

21. Between June 30, 2012 and July 7, 2012, there is little indication that the Decedent received any significant care concerning his head injury suffered in an assault on June 23, 2012. He should have been taken to a hospital when the first symptoms were evident.

22. When matters deteriorated to such an extent that the corrections officers noticed the marked change in behavior, Decedent should have been taken directly to the Emergency Room of the nearest hospital. Not only was it in his chart that he had sustained a head injury on June 23, 2012, but he also complained of pain that was a result of that injury.

23. The day before he was noted to be 'acting funny' and left to die, Decedent

3

complained to the Prison Staff and its medical department that 'his head [was] throbbing daily' and that he was 'feeling nauseous and dizzy.' However, the Decedent was not transferred to a local medical facility for evaluation and review.

24. Despite the repeated complaints of the Decedent, the Defendants, including but not limited to the medical staff, ignored obvious symptoms and indications that Decedent was suffering from a severe head/brain injury and/or seizure and denied him the treatment/attention he needed to live.

25. On July 7, 2012, at least two hours after he was exhibiting clear symptoms of a serious head/brain injury and/or seizure, a medical emergency was finally declared. Eventually, when staff from Defendant Easton Emergency Squad finally arrived, said staff indicated that they were not prepared to treat a seizure patient and did not have necessary equipment/tools/medication. Defendant Easton Emergency Squad actions, errors and omissions constituted gross negligence. . .

26. As a result of the failure of the Defendants to provide reasonable timely and appropriate medical care to the Decedent, and to have him transferred to an appropriate medical facility to address his condition as it progressed and immediately as it worsened, the Decedent's head/brain injury and/or seizure(s) caused him to lose his life. Decedent was declared dead on or after July 11, 2012.

(ECF. 13, ¶¶ 14-26).

In Pennsylvania, the statute of limitations applicable to a survival actions appears at 42 Pa.C.S. § 5524(2) and provides that "[a]n action to recover injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another" must be commenced within two years. The two year period begins to run "from the time the cause of action accrued . . ." 42 Pa.C.S. § 5502(a).

In a survival action, the statute of limitations generally begins to run on the date of injury, as though the decedent was bringing his own lawsuit. Baumgart v. Keene Bldg. Prods. Corp., 633 A.2d 1189, 1192 (Pa. Super. 1993)(en banc), appeal granted 644 A.2d 1195 (1994). However, in a survival action, the discovery rule causes the statute of limitations to begin to run

4

on the date the victim recognized, or in the absence of due diligence, should have recognized, the fact of a cause of action. Pastierik v. Duquesne Light Co., 514 Pa. 517, 524 (1987). In other words, the statute of limitations in a survival actions runs from the date of the tort. Pisano v. Extendicare Homes, Inc., 77 A.3d 651,657 (Pa. Super. 2013); Moyer v. Rubright, 651 A.2d 1139, 1143 (Pa. Super. 1994).

Count VIII of the Amended Complaint is a survival claim against PrimeCare sounding in ordinary negligence. (ECF 13, ¶¶ 60-63). PrimeCare moves to dismiss Count VIII on the basis that it is barred by Pennsylvania's two year statute of limitations. Specifically, PrimeCare contends that since the Amended Complaint alleges that between **June 30, 2012 and July 7, 2012**, plaintiff's decedent was aware of both his injuries and that PrimeCare and the other defendants failed to adequately respond (ECF 13, ¶¶ 14, 24), his survival action claim against PrimeCare filed more than two years later on **July 10, 2014** must be dismissed. The Court agrees and will dismiss Count VIII of the Amended Complaint. Baumgart, supra.

PrimeCare also seeks to have Counts VII and VIII (wrongful death) dismissed because plaintiff failed to file within 60 days of the filing of her original complaint a certificate of merit as required by Pennsylvania Rule of Civil Procedure 1042.3.[1] Plaintiff's counsel admits that he failed to timely file the certificate of merit, but attributes his failure to an oversight because the

---

[1] That Rule provides, in pertinent part: "In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall with the complaint or within sixty days after filing the complaint, a certificate of merit signed by the attorney or party. . ." Pa.R.C.P. 1042.3(a).

5

action was removed to federal court.[2] The Court notes that plaintiff has now attached to her response brief to PrimeCare's motion to dismiss the requisite certificate of merit. (Doc. 21-2). Because of the public interest in having disputes resolved on their merits rather than on an admitted oversight by counsel, the Court will deny the motion to dismiss based on the lack of a certificate of merit.

---

[2] "Federal courts in Pennsylvania have uniformly held that the [certificate of merit] requirement is a substantive rule of law that applies to professional liability actions proceeding in federal court." Stroud v. Abington Memorial Hosp., 546 F. Supp. 2d 238, 248 (E.D. Pa. 2008) (citing cases)..